IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RAYMOND LANCE BRIGGS, Individually, and as Personal Representative of the Estate of KELSEY SHELTON SMITH-BRIGGS, Deceased, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. CIV-06-677-D |
| THE STATE OF OKLAHOMA, *ex rel.*, THE OKLAHOMA DEPARTMENT OF HUMAN SERVICES, *et al.*, | ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| RAYE DAWN SMITH, | ) ) | |
| Intervenor. | ) | |

## **MEMORANDUM DECISION**

On January 8, 2010, an evidentiary hearing was held in connection with the plaintiff's request to have the net proceeds of the approved settlement herein ("Net Proceeds") apportioned. The plaintiff, Raymond Lance Briggs ("Mr. Briggs"), appeared personally and through counsel; the limited intervenor, Raye Dawn Smith ("Ms. Smith"), also appeared personally and through counsel. Mr. Briggs contends that the full amount of the Net Proceeds should go to him; Ms. Smith intervened in this case for the limited purpose of requesting that the court apportion half of the Net Proceeds to her.

As will be discussed later in greater detail, two Oklahoma statutes initially come to bear on the Court's consideration of this matter: Okla. Stat. tit. 12, §1053 and §1055.[1] Section 1053 recognizes that recoverable damages include the mental pain and anguish suffered by the decedent, the pecuniary loss to the survivors, and the grief and loss of companionship suffered by the parents; and further states that the court shall determine the proper division between survivors where the recovery is to be distributed according to a person's pecuniary loss or loss of companionship. *See id*. § 1053(B), (D). Section 1055 similarly delineates categories of damages where the decedent is a minor child, which include loss of companionship and love of the child, destruction of the parent-child relationship, and loss of monies expended by parents in support and education of the child, "in such amount as, under all the circumstances of the case, may be just." *Id*. § 1055.

At the hearing the parties presented evidence and argument,[2] and they also presented post-hearing written submissions. Relevant evidence fell generally into three categories: evidence of the quality of the parties' relationship with the minor child who was the subject of the underlying wrongful death claim, Kelsey Smith-Briggs ("Kelsey"); evidence regarding the impact on the parties of the destruction of the parent-child relationship as a result of Kelsey's tragic death; and evidence

---

[1] As discussed further *infra*, another statute arguably implicated by a non-accidental death is the so-called "slayer statute," Okla. Stat. tit. 84, § 231, which bars inheritance from an estate where the potential taker was convicted of the murder or manslaughter of the decedent. This statute does not apply in this case because Ms. Smith was not convicted of the crimes set forth in the statute. Nevertheless, a similar common law doctrine has potential application to this case. *See State Mut. Life Assur. Co. v. Hampton*, 696 P.2d 1027 (Okla. 1985).

[2] Some of the evidence presented by each side was discounted, or disregarded altogether, as either marginally relevant, irrelevant, or qualitatively unworthy of consideration due to concerns of reliability. For instance, testimony for which the witnesses lacked personal knowledge, unreliable hearsay, improper character evidence, and speculative conclusions were disregarded. Also disregarded were evidence and argument regarding various instances when the protections of the Fifth Amendment were invoked. The evidence primarily relied upon by the Court is discussed in this Order; other proffered evidence not mentioned herein was either disregarded, or was of insignificant probative force.

2

in connection with Mr. Brigg's assertion that, because of Ms. Smith's purported involvement in the events that led to Kelsey's death, she should be precluded from sharing in any of the Net Proceeds. This evidence, and the Court's findings and conclusions based upon the preponderance of the evidence, are discussed below in slightly different sequence.

1. **The Parties' Relationship With Kelsey**

    A. **Mr. Briggs**

Mr. Briggs and Ms. Smith were divorced prior to Kelsey's birth on December 28, 2002. To clear up questions of paternity, a DNA test was performed. The test results received in April, 2003, established that Mr. Briggs was Kelsey's father. Soon thereafter he began exercising regular visitation with Kelsey. The testimony of Mr. Briggs and members of his family established that he was an involved and loving father; he enjoyed spending time with Kelsey and she enjoyed spending time with him. He was a hands-on parent, who readily provided direct care for Kelsey such as feeding her, changing her diapers, playing with her, and reading to her. Mr. Briggs encouraged a relationship between Kelsey and her extended family, and they enjoyed together time with grandparents, aunts, and cousins. When Mr. Briggs was remarried, his new wife fully accepted Kelsey, and was a loving and involved step-mother.[3]

In the summer of 2004 Mr. Briggs, a member of the U.S. Army Reserve, was called to active duty service; he began pre-deployment training in September, 2004, and was eventually deployed to Iraq in May, 2005. It was his desire that his wife and his parents exercise visitation with Kelsey

---

[3] This marriage, too, ended in divorce; however, the evidence established that for the duration of the marriage Kelsey's step-mother helped to promote a positive relationship between Kelsey and Mr. Briggs.

while he was away from Oklahoma, and, with court intervention, they were able to do so. Mr. Briggs did not return permanently to Oklahoma until October 12, 2005.

### B. Ms. Smith

For reasons that are not particularly relevant to the issues before the Court, during her pregnancy Ms. Smith was not forthcoming about the possibility that Mr. Briggs could be Kelsey's father, and after Kelsey's birth she was reluctant to allow Mr. Briggs to spend time with Kelsey. Nevertheless, after paternity was established, Ms. Smith, for the most part, complied with the visitation schedule and cooperated with Mr. Briggs and his family regarding Mr. Briggs' visitation periods. Still, for the first two years of Kelsey's life, except for the periods of Mr. Briggs' visitation, Kelsey was mostly in the care and custody of Ms. Smith, in and around the community of Meeker, Oklahoma. Indeed, during that time Ms. Smith was the primary physical custodian of Kelsey.

Ms. Smith's testimony established that she directly provided for Kelsey's day-to-day needs and care; when Ms. Smith returned to school, and, later, full time employment, she arranged for suitable baby sitting and daycare for Kelsey. Ms. Smith recounted the milestones of Kelsey's first two years: favorite foods, first words, learning to walk. Ms. Smith, too, promoted a relationship between Kelsey and her grandparents and extended family, and Kelsey appears to have enjoyed spending time with Ms. Smith's mother, especially. For the first couple of years of Kelsey's life she appeared to be heathy and happy in Ms. Smith's care, and their relationship was mutually loving. But, as discussed below, in the third year of Kelsey's life things started to go very wrong.

## 2. Evidence of Abuse

In January, 2005, roughly corresponding to the onset of Ms. Smith's relationship with Michael Porter, Kelsey began suffering suspicious injuries. There was a supposed fall from her crib, resulting in a broken collarbone and bruises on her face; at about the same time, during visitation with Mr. Briggs, he and his wife discovered marks on Kelsey's buttocks, which looked like marks from a spanking. They took photos of the injuries – several of which were submitted as evidence during the hearing – and they took Kelsey to the hospital to be examined. These incidents marked the beginning of a series of injuries, allegations, complaints to child welfare agencies, and legal proceedings which would persist until Kelsey's tragic death on October 11, 2005. For purposes of the determinations necessary in the instant case, the evidence compiled during an agency investigation after Kelsey's death established the following:

| Approximate Date | Injury | In the Care of |
| --- | --- | --- |
| 1/8/2005 | broken collar bone | mother |
| 1/8/2005 | bruising and abrasions/confirmed abuse | mother |
| 3/24/2005 | bruising on nose and knee/ closed head injury | mother |
| 4/14/2005 | sprained ankle and bruising | mother |
| 4/15/2005 | bruising to both thighs and rib cage | mother |
| 4/25/2005 | child refused to walk/diagnosed with broken legs | mother* |
| 4/27/2005 | bruising to nose and eyebrows | mother |

---

* The child was in the care of the paternal grandmother from April 18-21 and in the care of Ms. Smith from April 21-25, 2005.

5

- 8/19/2005     bruise on left cheek (before auto accident)     mother
- 8/19/2005     bruise on forehead, reddened area of eye     mother
- 8/23/2005     refusing food     mother
- 8/23/2005     bruises on left hip, left cheek, jaw     mother
- 8/27/2005     red spots in the eye     mother
- 9/2/2005     rub burns to the eye     mother

These events culminated on October 11, 2005, when, according to Ms. Smith, she left Kelsey sleeping soundly and in the care of Michael Porter, only to return to the home to see Kelsey being taken away in an ambulance. At the hospital, Ms. Smith learned that Kelsey was dead; later, the cause of death was determined to be blunt force trauma to the abdomen.[4] Eventually, Mr. Porter and Ms. Smith faced criminal charges in connection with Kelsey's death. Mr. Porter pled guilty to the crime of enabling child abuse by injury, Okla. Stat. tit. 10, § 7115(B); Ms. Smith was convicted by a jury of the same offense. Her conviction is on appeal, and, thus, the criminal judgment against her is not final.[5] At the time of Kelsey's death, and for months preceding it, Mr. Briggs was on active duty with the U.S. Army, stationed outside of Oklahoma.

---

[4] During the hearing Ms. Smith presented the testimony of Dr. Robert Bux, M.D., a forensic pathologist, on the issue of whether Kelsey experienced conscious pain and suffering from the blunt force trauma before succumbing to her injuries. If such pain and suffering is established, Okla. Stat. tit. 12, § 1053(B) allows for an apportionment of damages to the estate of the minor child, to be distributed according to the rules of intestate succession. However, Dr. Bux's testimony was inconclusive on this issue, in that he could not state with certainty whether death occurred within minutes or hours after the blunt force trauma was inflicted. He testified that Kelsey would have been "immediately symptomatic" after the blow until the time she "passed out," but he could not say when unconsciousness would have occurred and whether or not it would have been immediate.

[5] However, Ms. Smith's criminal conviction is admissible to establish the facts on which it is based in a civil proceeding arising out of the same events. *See Benham v. Plotner*, 795 P.2d 510, 512 (Okla. 1990).

### 3. The Impact of Kelsey's Death and Destruction of the Parent-Child Relationship

#### A. Mr. Briggs

Testimony established that Kelsey's death has had a profound and lasting impact on Mr. Briggs and his quality of life. He was described by family members who testified as being a "lost" and "broken" man since Kelsey's death. He has experienced extreme grief and severe depression, and has sought mental health counseling. He no longer enjoys life events, such as holidays with his family, and at times has difficulty interacting with his family members. Clearly, Mr. Briggs' grief has been, and continues to be, substantial.

#### B. Ms. Smith

Ms. Smith testified emotionally about not being allowed in the ambulance when Kelsey was taken to the hospital, and how she felt upon learning of Kelsey's death. She stated that she thinks about Kelsey every day, and talks about her constantly as a way to stay in touch with the memory of Kelsey. Ms. Smith testified that she prays for "God to take me" so she can be with Kelsey. Although Ms. Smith has been affected emotionally by Kelsey's death, the Court did not find her testimony on these issues to be entirely credible. However, even accepting Ms. Smith's testimony regarding the depth of her grief, for reasons set forth below, she cannot be allowed to share in the Net Proceeds from claims relating to the death of Kelsey.

### 4. The Applicable Law

Oklahoma's wrongful death statute, which governs the issues presented, authorizes the Court to determine the proper division of the Net Proceeds for the loss established by the evidence, that is, a loss of companionship. *See* Okla. Stat. tit. 12, § 1053(D); *see also Plain v. Murphy Family Farms*, 296 F.3d 975, 982 (10th Cir. 2002); *Superior Supply Co. v. Torres*, 900 P.2d 1005, 1007-08

(Okla. Civ. App. 1995).[6] As discussed above, the recoverable damages for Kelsey's death include the parents' "loss of companionship and love of the child" and "destruction of [the] parent-child relationship." *See* Okla. Stat. tit. 12, § 1055. In deciding an apportionment of these damages, "[t]he relationship existing between decedent and [a claimant] within a reasonable time period before death is entitled to the court's careful consideration." *See Plain*, 296 F.3d at 982. Further, proceedings for the apportionment and distribution of a wrongful death settlement fund are equitable in nature and, therefore, governed by equitable principles. *See In re Estate of Lovely*, 848 P.2d 51, 53 (Okla. Civ. App. 1993). Evidence of the quality of a parent-child relationship immediately preceding a child's death may weigh heavily in assessing the extent of the parent's grief and loss. *See id.* at 54.

Oklahoma's so-called "slayer statute," Okla. Stat. tit. 84, § 231, bars a beneficiary from taking by will, intestate succession, or insurance policy as a result of a death for which the beneficiary is convicted of murder or first degree manslaughter. This statute implements a common law doctrine and the equitable principle that a person may not benefit from his own wrongful conduct. *See State Mut. Life Assur. Co. v. Hampton*, 696 P.2d 1027, 1031 (Okla. 1985). The common law rule is neither limited nor abrogated by the statute; courts may continue to apply the common law rule where a beneficiary has played a part in causing the death, even though the beneficiary has not been convicted of murder or manslaughter.[7] Under the doctrine, it is the

---

[6] The distribution of any damages for injury to the decedent, such as mental pain and anguish, would be property of the estate and within the jurisdiction of the probate court. *See Plain*, 296 F.3d at 977 n.8. However, as stated above (*see supra* note 4), the Court finds insufficient evidence on which to determine any damages for mental pain and anguish in this case.

[7] In Oklahoma, the common law remains in full force and effect unless expressly abrogated by statute. *See Tucker v. ADG, Inc.* 102 P.3d 660, 668 (Okla. 2004); *Tate v. Browning-Ferris, Inc.*, 833 P.2d 1218, 1225-26 (Okla. 1992).

beneficiary's felonious act causing the decedent's loss of life, rather than a conviction of the killing, that warrants a disqualification from recovery. *See id.* at 832. Further, it is an age-old maxim of equity that one who seeks equity must come to court with clean hands. *See*, *e.g.*, *Camp v. Camp*, 163 P.2d 970, 972 (Okla. 1945); 30A C.J.S. *Equity* § 109 (2009).

**5. Conclusions**

The applicable statutes, as noted above, require that the Net Proceeds from this wrongful death action must be apportioned by the Court to the parents of the minor based upon their grief, the loss of companionship and love of the child, and destruction of the parent-child relationship. The evidence reasonably established that Kelsey's death has had a greater emotional impact on Mr. Briggs. However, even accepting that Ms. Smith's grief might otherwise allow for some apportionment to her, the Court is guided in this matter by equitable principles, and those principles dictate that Ms. Smith take nothing.

The evidence at the hearing established an alarming pattern of injuries to Kelsey while she was in the care and custody of Ms. Smith. Ms. Smith herself acknowledged as much during cross-examination. It cannot be reasonably argued that these injuries were not the result of repeated abuse. Moreover, the severe trauma inflicted on October 11, 2005, again while she was in the care and custody of Ms. Smith, resulted in Kelsey's death. It may never be known with certainty whether the fatal injuries were inflicted by Ms. Smith or Mr. Porter – such a determination, however, is not necessary here. The evidence clearly established that Ms. Smith was aware Kelsey was being

harmed, and at the very least, she culpably failed to protect Kelsey from further harm. Equity dictates that one ought not benefit from her own wrong.[8]

**ORDER**

For these reasons, the Court awards the entire amount of the Net Proceeds to Mr. Briggs and orders that Ms. Smith take nothing on her claim to a portion of the Net Proceeds. Judgment shall be entered accordingly.

IT IS SO ORDERED this 9th day of February, 2010.

_____
TIMOTHY D. DEGIUSTI
UNITED STATES DISTRICT JUDGE

---

[8] Clearly, as between the parents, Ms. Smith alone stood in a position to intervene to protect Kelsey from harm and death, but she failed to do so and thereby contributed to (if she did not inflict) Kelsey's fatal injuries. Mr. Briggs, who is blameless in the matter of Kelsey's death, has been devastated by his feelings of loss and grief. Ms. Smith's feelings, while perhaps no less real to her now, were entirely avoidable had she properly tended to the parent-child relationship during the time period immediately preceding Kelsey's death.